**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

COMMUNITY HOSPITAL OF THE
MONTEREY PENINSULA,

Plaintiff,

v.

AETNA LIFE INSURANCE COMPANY,

Defendant.

Case No.  19-cv-00328-BLF

**ORDER DENYING PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

[Re: ECF 51; 55]

This case arises from partially unpaid bills for medical services provided by Plaintiff Community Hospital of the Monterey Peninsula ("CHOMP" or the "Hospital") to one of Defendant Aetna Life Insurance Company's ("Aetna") health plan members.

Before the Court is the parties' cross motions for summary judgment.  On June 5, 2020, CHOMP filed its Motion for Partial Summary Judgment. Pl.'s Mot. for Partial Summ. J. ("Pl. MSJ"), ECF 51.  On June 15, 2020, Aetna field its opposition to CHOMP's Motion for Summary Judgment and its own Cross Motion for Partial Summary Judgment.  Def.'s Opp. to Pl. MSJ and Def.'s Mot. for Partial Summ. J. ("Def. MSJ"), ECF 55-1.  On June 25, 2020, CHOMP filed its opposition to Aetna's Motion for Partial Summary Judgment and reply in support of its own Motion for Partial Summary Judgment.  Pl.'s Opp. to Def. MSJ and Pl.'s Reply ISO Pl.'s MSJ ("Pl. Reply"), ECF 58.  On July 2, 2020, Aetna filed the final reply brief in support of its Motion for Partial Summary Judgment.  Reply in ISO Def.'s Motion for Partial Summary Judgment ("Def. Reply"), ECF 65.  The Administrative Record ("AR") is filed under seal at ECF 54-6 and ECF 54-7.  The Court heard oral arguments on July 9, 2020 (the "Hearing").

For the reasons stated below, the Court DENIES CHOMP's Motion for Partial Summary

1  Judgment at ECF 51 and GRANTS Aetna's Motion for Partial Summary Judgment at ECF 55.

2  **I.   BACKGROUND**

3  Plaintiff CHOMP's remaining claim in this case arises from the partially unpaid bills

4  associated with Patient P.R.'s stay at CHOMP from January 1, 2016 to January 23, 2016.[1]

5  **A.   The Relationship between the Parties**

6  CHOMP is a full-service hospital in Monterey, California.  Pl. MSJ at 3.  Prior to January

7  2016, CHOMP and Aetna had no contractual relationship governing reimbursement for healthcare

8  services, and CHOMP was considered "out-of-network" for Aetna's members.  *Id.*

9  Before January 2016, a dispute arose between CHOMP and Aetna regarding payment for

10 health care services.  As a result, the parties entered into a confidential settlement ("Settlement

11 Agreement") on January 5, 2016.  AR at 964-70.  Around the same time, the parties negotiated a

12 Hospital Services Agreement ("HSA") effective February 1, 2016.  *Id.* at 971-1017.  Pursuant to the

13 Settlement Agreement, claims with dates of service from September 25, 2015 to February 1, 2016,

14 would be processed according to the terms of the HSA and the applicable plan.  *Id.* at 966, ¶ 3(b);

15 *Id.* at 971.  Patient P.R.'s claim for benefits falls within this time period.  Pl. MSJ at 3-4; Def. MSJ

16 at 3.  CHOMP has an assignment of benefits from P.R.  Pl. MSJ at 13; Def. MSJ at 13.

17 **B.   Patient P.R.**

18 P.R. is a 63-year-old woman with a history of end-stage chronic obstructive pulmonary

19 disease ("COPD") during the relevant time period.  AR at 191.  Shortly prior to the hospital stay at

20 issue in this case, P.R. was hospitalized from December 7, 2015 to December 28, 2015.  *Id.*  On

21 January 1, 2016, P.R. presented to CHOMP's emergency department due to a worsening shortness

22 of breath and was admitted to the hospital.  *Id.*  CHOMP admitted P.R., placed her in the telemetry

23 unit and referred her to discharge planning and requested a social worker on the same day.  *Id.* at

24 192, 262, 264.  From January 3, 2016 to January 5, 2016, P.R.'s doctors treated her shortness of

25 breath and other symptoms, predicted that she would be hospitalized for "the next couple of days,"

26

27 ─────────────────

[1] CHOMP's claims arising from service provided to another Aetna patient (Patient F.F.) have settled.
28 ECF 52.  And the Court dismissed CHOMP's claims 1-6 and 8.  ECF 56 (redacted version at ECF 62).

United States District Court
Northern District of California

United States District Court
Northern District of California

and considered discharging her with "home hospice." *Id.* at 220-22. On January 6, 2016, P.R.'s doctor noted that her "main problem seems to be that she does not comply with her medical program when she leaves the hospital, i.e., she does not take her medication, she refused oxygen." *Id.* at 224.

On January 7, 2016, P.R.'s treating physician, Dr. Jefferey Barnum, issued an order discharging P.R. to her residence with home health care to assist with her needs. AR at 253. But discharge was placed on hold because P.R. was "very sedated or sleepy and unsafe to send home." *Id.* at 482. In addition, the home health care agency subsequently reported that it would not provide care to P.R. because "her home environment was unsafe for her condition." *Id.* at 482. According to the report, P.R. "live[d] in a shack behind a home that [wa]s not insulated and d[id] not have heat." *Id.* at 483. CHOMP then began to locate a skilled nursing facility placement for P.R. *Id.* CHOMP's discharge planners contacted three facilities on that day. *Id.* at 483. Two facilities declined the referral on the same day, and the third one rejected the referral the next day. *Id.* at 483; 484.

On January 8, 2016, P.R.'s doctor reported that P.R. appeared to be "pretty much at her baseline, which is marginal" and "unable to care for herself." AR at 225. The discharge planner contacted another skilled nursing facility and was rejected. *Id.* at 484. On January 9, 2016, P.R. was transferred from her monitored bed in the telemetry unit to non-monitored bed in a medical surgical unit. *Id.* at 252, 599. P.R.'s doctor reported that "she await[ed] placement, which [wa]s difficult due to her insurance." *Id.* at 226. "She [wa]s at baseline and can probably be discharged whenever suitable arrangements have been made." *Id.*

From January 10, 2016 to January 18, 2016, P.R.'s doctors repeatedly reported that while she was an end-stage COPD patient with oxygen and steroid dependency, she was "breathing comfortably" while at rest, did not have "pain" or "discomfort." was "breathing at her baseline," and was "stable." AR at 227-39. The doctors also reported that P.R. had "extremely poor social support" and "fail[ed] to thrive in the outpatient setting" and thus, CHOMP would "continue to work with discharge planning on locating appropriate placement for her." *Id.*

During this time, CHOMP's discharge planners reported receiving a call from Aetna on January 14, 2016, providing contact information for six skilled nursing facilities Aetna contracted

3

United States District Court
Northern District of California

with.  AR at 486.  On January 15, 2016, the discharge planner reported that three of the six skilled nursing facilities either did not have beds or declined.  *Id.* at 487.  On January 18, 2016, one of the three remaining skilled nursing facilities was found to not be in contract with Aetna.  *Id.* at 488.  The discharge planner also reported that a call to Aetna was made and a message was left.  *Id.*  The note also stated that the discharge planner "[m]ust call again on non-holiday to ask for help with placement with Aetna contracted facilities."  *Id.*

On January 19, 2016, Aetna notified CHOMP that it was not authorizing services as of January 15, 2016 because the services provided to P.R. could have been completed at a "less intensive level of care or setting."  AR at 943.  Aetna had previously approved services from January 1, 2016 to January 14, 2016.  *Id.* at 896-936.  On the same day, P.R.'s doctor reported that P.R. did not have any pain or discomfort and "really remained at baseline."  *Id.* at 240.  The doctor alerted discharge planning and social work that the patient "will have to discharge from the hospital tomorrow."  *Id.*  The discharge planner noted that P.R. "really has no skilled needs" and "[w]ill need a taxi ride home."  *Id.* at 489.  However, the discharge planner later learned that P.R. has been served with an eviction notice and her living environment was unsuitable for her condition.  *Id.* at 493.  P.R.'s landlord was scheduled to leave the state, leaving P.R. with access to her "shack" but not the kitchen, phone, or bathroom in the main house.  AR at 500.  CHOMP then started to look for a residential care facility that could accept P.R.  *Id.*  Her doctor's report reflected that P.R. was "medically stable for discharge" and social worker found a residential care facility for P.R. on the same day.  *Id.* at 501.  On January 22, 2016, CHOMP completed the necessary paperwork to send P.R. to the residential care facility.  *Id.* at 502.  On January 23, 2016, P.R. was discharged.  *Id.* at 246, 502.

### C.    The Dispute and Appeal

On March 3, 2016, pursuant to an assignment of plan benefits from P.R., CHOMP billed Aetna $254,745.00 for the services provided to P.R. from January 1, 2016 through January 23, 2016. *See* Exhibit G to Declaration of Angela Cadena ("Cadena Decl."), ECF 50-11.  In February and March of 2016, Aetna made partial payments in the amount of $129,857.08, and denied the balance. *See* Exhibit H to Cadena Decl.  On June 28, 2016, CHOMP appealed the denial. *See* Exhibit I to

Cadena Decl.  Following the June 28, 2016 appeal, on August 10, 2016, Aetna made a further payment in the amount of $40,072.64 but continued to deny the balance due for dates of service from January 15, 2016 through January 23, 2016.  *See* Exhibit J to Cadena Decl.

On September 8, 2016, CHOMP sent "first level appeal request" to Aetna, regarding the denial decision made on services provided to P.R. from January 15, 2016 to January 23, 2016.  AR at 167-69.  On November 3, 2016, Aetna responded by requesting additional documents.  *Id.* at 850.  CHOMP resubmitted its appeal on November 18 and December 15, 2016.  Pl. MSJ at 13-14.  On December 31, 2016, Aetna again responded and stated that the appeals were untimely because the notification of payment dispute was not submitted within 180 days after the initial claim decision.  AR at 952.  On June 22, 2017, Aetna notified CHOMP that the 180-day denial was averted "due to a retrospective update to [CHOMP's] exception to timely filing" allowing CHOMP 365 days to appeal retrospective to February 1, 2016.  *Id.* at 950.  On June 23, 2017, Aetna's medical director reviewed the case and Aetna sent a final appeal resolution letter to CHOMP, upholding the previous denial decision because P.R. "no longer met acute inpatient criteria."  *Id.* at 956-61.

### D.   Patient P.R.'s Plan

P.R. was covered under CVS Caremark Health Savings Plan (the "Plan"), governed by Employee Retirement Income Security Act of 1974 ("ERISA").  *See* AR at 1-141.  The Plan is self-insured and sponsored by CVS Pharmacy, Inc. and its participating affiliates (collectively, "CVS").  AR at 111.  The Plan Administrator is the Senior Vice President and Chief Human Resources Officer of CVS Pharmacy, Inc.  *Id.* at 112.  The Plan Administrator has delegated to Aetna, a health care insurance company, the discretionary authority to determine all claims under the Plan and to perform a full and fair review of each claim denial which has been appealed by a claimant or his or her authorized representative.  *See* AR at 112.

P.R.'s health plan covers inpatient hospital care, including discharge planning services, skilled nursing care, home health care, hospice care, and emergency and urgent care of an emergency condition.  AR at 46, 54-56.  The Plan's terms and definitions relevant to this dispute are as follows:

> **What the Plan Covers**
> In this section, you'll find more detailed information about the services and supplies covered by the Plan. It's important to remember

United States District Court
Northern District of California

that the Plan covers only services and supplies that are **necessary** to diagnose or treat an illness or injury. If a service or supply is not necessary, it will not be covered, even if it is listed as a covered expense in this book.

AR at 39.

**What the Plan Does Not Cover**
…
The plan does ***not*** cover "custodial and protective care," including:

- Any item or service that is primarily for the personal comfort and convenience of you or a third party;
- Care provided to create an environment that protects a person against exposure that can make his or her disease or injury worse.

AR at 69.

**Emergency Condition**
This means a recent and severe medical condition — including (but not limited to) severe pain — that would lead a prudent layperson, possessing an average knowledge of medicine and health, to believe that your condition, sickness or injury is of such a nature that failure to get immediate medical care could result in:
- Placing your health in serious jeopardy;
- Serious impairment to bodily function;
- Serious dysfunction of a body part or organ; or
- Serious jeopardy to the health of the fetus (in the case of a pregnant woman).

AR at 117.

**Necessary/Medically Necessary**
Health care services and supplies that a physician, other health care provider or dentist, exercising prudent clinical judgment, would provide to a patient for the purpose of evaluating, diagnosing or treating an illness, injury or disease. The service or supply must be:

- Provided in accordance with generally accepted standards of medical or dental practice;
- Clinically appropriate, in terms of type, frequency, extent, site and duration;
- Considered effective for the patient's illness, injury or disease;
- Not primarily for the convenience of the patient, physician, dentist or other health care provider; and
- Not more costly than an alternative service or sequence of services that would be at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

For these purposes, "generally accepted standards of medical or dental practice" means standards that are:

- Based on credible scientific evidence published in peer-reviewed literature generally recognized by the relevant

> medical or dental community; or
> - Otherwise consistent with physician or dental specialty society recommendations and the views of physicians or dentists practicing in relevant clinical areas and any other relevant factors.

AR at 121-22.

## II.    STANDARD OF REVIEW

ERISA is a federal law that sets minimum standards for most voluntarily established retirement and health plans in private industry, aiming to provide protection for individuals and their beneficiaries covered under these plans. *See generally* Employment Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 (codified as amended at 29 U.S.C. §§ 1001-1461) (2006). ERISA gives plan participants a private right of action to recover benefits. 29 U.S.C. § 1132(a)(1)(B). Because ERISA does not specify the standard of review, federal courts have developed a body of common law that supplies the appropriate governing authority. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962 (9th Cir. 2006).

When the terms of an ERISA plan unambiguously grant discretion to the plan, the denial of benefits is reviewed for abuse of discretion. *Pac. Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1039–40 (9th Cir. 2014). CHOMP and Aetna agree that the Plan gives Aetna discretion to determine eligibility for benefits, rendering abuse of discretion review appropriate. Pl. MSJ at 17; Def. MSJ at 11. And neither party argues that *de novo* review would be appropriate under any recognized exception.

The parties dispute, however, whether the Court may consider evidence outside of the administrative record or temper its abuse of discretion review with skepticism. Generally, in reviewing a plan administrator's decision under the abuse of discretion standard, courts are "limited to the record before the plan administrator." *Jebian v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan*, 349 F.3d 1098, 1110 (9th Cir. 2003). As the Ninth Circuit held in *Abatie*, "a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on de novo review." 458 F.3d at 970. There are two exceptions to this general rule.

***First***, if there is evidence of plan administrator's conflict of interest, the abuse of discretion

is "tempered by skepticism." *Abatie*, 458 F.3d at 959.  The existence of a conflict does not "alter[] the standard of review itself, rather than merely its application."  *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 631 (9th Cir. 2009).  "As *Abatie* explicitly held, if a conflict of interest exists, 'abuse of discretion review applies' and 'that conflict must be weighed as a factor in determining whether there is an abuse of discretion.'" *Id.* (quoting *Abatie*, 458 F.3d at 965). Accordingly, when a court must decide how much weight to give a conflict of interest, courts "may consider evidence beyond that contained in the administrative record that was before the plan administrator, to determine whether a conflict of interest exists that would affect the appropriate level of judicial scrutiny." *Abatie*, 458 F.3d at 970.  However, once that determination is made, the decision on the merits must rest on the administrative record, and not the extrinsic evidence.  *Id.*

**Second**, "[w]hen a plan administrator has failed to follow a procedural requirement of ERISA, the court may have to consider evidence outside the administrative record."  *Abatie*, 458 F.3d at 972–73.  If flagrant enough, procedural noncompliance with ERISA can remove the plan administrator's decision from abuse of discretion to de novo review.  *See id.* at 971.  But when procedural irregularities are smaller, abuse of discretion review applies and "the court may take additional evidence when the irregularities have prevented full development of the administrative record." *Id.*  Under these circumstances, "the court may, in essence, recreate what the administrative record would have been had the procedure been correct." *Id.*; *see also Pac. Shores Hosp.*, 764 F.3d at 1041.  In addition, "[w]here there are 'procedural irregularities' in the claim review process, the abuse of discretion standard that is applied by the district court will be 'tempered' by heightened skepticism." *Hoffman v. Screen Actors Guild Producers Pension Plan*, 757 F. App'x 602, 604 (9th Cir. 2019) (quoting *Abatie*, 458 F.3d at 951, 971).  In other words, procedural irregularities during a plan administrator's review must "be weighed in deciding whether an administrator's decision was an abuse of discretion." *Abatie*, 458 F.3d at 972.

### A.    Conflict of Interest

In its briefing, CHOMP argues that "there is substantial evidence of procedural irregularities and potential conflict of interest that warrant skepticism of defendant's denial decision and that allow for consideration of evidence outside of the administrative record."  Pl. MSJ at 17.  CHOMP

United States District Court
Northern District of California

fails, however, to articulate any conflict of interest in this case.  Aetna is the claim administrator of P.R.'s Plan and the Plan is self-funded, meaning Aetna does not pay for the benefits.  *See* AR at 111.  At the Hearing, CHOMP conceded that no conflict of interest has been identified.  Thus, the Court's review under the abuse of discretion standard is not "tempered by skepticism" based on a conflict of interest and the Court may not consider evidence beyond the administrative record regarding conflict of interest.

## B.     Procedural Irregularities

Next, CHOMP points to several procedural irregularities, which it argues warrant consideration of extrinsic evidence and tempering of the abuse of discretion standard of review standard with skepticism.  "[I]n the context of ERISA procedural violations, discovery outside the administrative record is proper where there have been flagrant violations of ERISA procedure constituting substantive harm to the beneficiary, or where procedural violations have prevented the full development of the administrative record."  *DelDebbio v. Walgreens Co.*, No. C 11-01866 SI, 2012 WL 707155, at *2 (N.D. Cal. Mar. 5, 2012) (citing *Abatie*, 458 F.3d at 974).  For example, if a plan administrator "adds, in its final decision, a new reason for denial," that administrator's procedural violation is weighed in the abuse of discretion analysis and warrants introduction of extrinsic evidence because the violation "prevented full development of the administrative record." *Abatie*, 458 F.3d at 973-74.

CHOMP identifies five procedural irregularities in the processing of P.R.'s claim for benefits.  The Court addresses each argument in turn.

### 1.  Notification of Denial of Authorization for P.R.'s Care Between January 14 and January 19, 2016

***First,*** CHOMP argues that Aetna violated two ERISA requirements to notify CHOMP of "denial of a request for authorization of urgent care": (1) 29 CFR 2560.503-1(f)(2)(i), requiring ERISA plans to notify claimants of any denial of a request for authorization of urgent care within 72 hours of the request and (2) 29 CFR 2560.503-1(f)(2)(ii)(B), requiring that once a plan has approved an ongoing course of treatment involving urgent care, the plan must notify the claimant of a decision on a request to extend that course of treatment within 24 hours of the request.  Pl. MSJ

at 18.  CHOMP argues that Aetna violated these requirements by providing ongoing authorizations for P.R.'s care through January 14, 2016, and then failing to communicate the denial of CHOMP's requests for ongoing care until January 19, at which time Aetna retroactively denied care provided after January 14.  *Id.*  Aetna responds that P.R.'s care cannot be considered "urgent" during the time period in question as defined by ERISA.  Def. MSJ at 13.

The Court agrees with Aetna.  Under ERISA, a "claim involving urgent care" is:

> [A]ny claim for medical care or treatment with respect to which the application of the time periods for making non-urgent care determinations –
> (A) Could seriously jeopardize the life or health of the claimant or the ability of the claimant to regain maximum function, or,
> (B) In the opinion of a physician with knowledge of the claimant's medical condition, would subject the claimant to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim.

29 CFR 2560.503-1(m)(1).

While there is no question that P.R. was very ill and at the "end-stage of COPD," there was nothing "urgent" in her condition or course of treatment during the disputed period (*i.e.*, January 15 to January 19, 2016).  CHOMP transferred P.R. on the first day of her stay from the emergency department to telemetry and discontinued all emergency orders on her first day of admission.  AR at 264.  Since January 7, 2016 (seven days before the denial of benefits), CHOMP had determined that P.R. could be discharged to an even lower level of care and was simply searching for a suitable accommodation for her.  AR at 253.  P.R.'s doctors repeatedly described her condition as "baseline" and reported no pain or discomfort.  *See* AR at 236-240.  On January 18, 2016, her doctor noted that "[t]he patient is medically stable for discharge pending arrangements by social services."  AR at 239.  P.R.'s condition cannot fairly be characterized as "urgent" as defined by the regulation triggering the expedited notification requirement set by ERISA for "urgent care."

Thus, CHOMP has not established that Aetna's January 19, 2016 denial notification was a procedural violation of 29 CFR 2560.503-1(f)(2)(i)-(ii)

### 2.  Delay in the Appeal Process

*Second,* CHOMP argues that Aetna failed to comply with ERISA's requirements for a full

United States District Court
Northern District of California

1    and fair appeal process.  ERISA requires that notification of the plan's determination on appeal must

2    be provided within 60 days of receipt of a request for review in the case of a single level appeal

3    process, and within 30 days of receipt of a request for review in the case of a two level appeal

4    process.  29 CFR 2560.503-1(i)(2)(iii)(A).  Separately, the HSA provides that Aetna will respond

5    to CHOMP's appeals within 45 business days.  AR at 971-1017 ("HSA").  CHOMP argues that

6    Aetna failed to meet these requirements because it denied the September 2016 appeal in July 2017

7    – ten months after its submission.

8         Aetna, on the other hand, argues that (1) the ERISA appeal requirements only apply to

9    appeals by participants, not healthcare providers such as CHOMP and (2) Aetna responded to all of

10   CHOMP's requests.  Def. SMJ at 13-14.  Specifically, Aetna notes that it replied to the September

11   2016 appeal on November 3, 2016, by requesting additional information.  Def. MSJ at 13 (citing

12   AR at 850).  When CHOMP resubmitted its appeal on November 18 and December 15, 2016, Aetna

13   responded on December 31, 2016, advising CHOMP that its appeals were untimely according to the

14   HSA.  AR at 952; 980, HSA ¶4.1.1 (requiring notification of payment dispute within 180 days).  On

15   June 22, 2017, the 180 denial was averted "due to a retrospective update to [CHOMP's] exception

16   to timely filing" and Aetna allowed CHOMP 365 days to appeal retrospective to February 1, 2016.

17   AR at 950.  Aetna then set up a replacement case and had the appeal reviewed by a medical director

18   resulting in the June 23, 2017 Final Appeal Resolution letter.  AR at 956-961.  CHOMP does not

19   dispute that it received the above-mentioned communications from Aetna.  *See generally*, Pl. Reply.

20        Even if the cited regulation is applicable to CHOMP as a healthcare provider (not plan

21   participant), the delay in responding to CHOMP's appeal does not rise to a level that would change

22   the standard of review or allow the introduction of extrinsic evidence.  While the Court recognizes

23   that the delay in the final determination of appeal was long and must have been frustrating, when a

24   plan administrator shows that it has engaged in an "ongoing, good faith exchange of information

25   between the administrator and the claimant," courts should give the plan administrator's decision

26   "broad deference notwithstanding a minor irregularity."  *Abatie v. Alta Health & Life Ins. Co.*, 458

27   F.3d 955, 972 (9th Cir. 2006).  Here, Aetna has shown that it was communicating with CHOMP to

28   resolve the appeal.  Aetna's irregularities in the appeal process, if any, were minor.  Moreover, the

procedural history of the appeal is not disputed and is properly reflected in the administrative record. Thus, the Court sees no basis to alter the abuse of discretion standard of review by allowing CHOMP to submit extrinsic evidence and supplement the record.

### 3. Delay in Full Payment for P.R.'s Care Between January 7 and January 14, 2016

*Third,* CHOMP asserts that it was a procedural irregularity for Aetna to initially deny full payment for P.R.'s stay from January 7 through January 14, 2016, but later pay the full amount in August 2016 in response to an appeal by CHOMP.  Pl. MSJ at 18.  CHOMP fails, however, to explain *why* this is a procedural irregularity – as opposed to evidence of an effective appeal process. Thus, CHOMP has not established that Aetna's delayed payment was a procedural irregularity.

### 4. Production of Documents

*Fourth,* CHOMP claims that during direct negotiation of P.R.'s claim as required by the HSA prior to bringing a lawsuit, Aetna failed to produce any documents in response to CHOMP's request "for all documents relied on or relevant to [Aetna]'s adverse benefit determination for P.R" in violation of 29 CFR 2560.503-1(j)(3).  Pl. MSJ at 19.  As the Court determined in its Order Granting Aetna's Motion to Dismiss, Aetna is not the plan administrator for P.R.'s Plan and the regulation CHOMP cites applies to the plan administrator (not the claim administrator such as Aetna).  *See* Order Granting Defendant's Motion to Dismiss at 13-14, ECF 56; s*ee also* 29 CFR 2560.503-1(j) ("The plan administrator shall provide …").

Thus, CHOMP has not established that Aetna violated 29 CFR 2560.503-1(j)(3).

### 5. Consideration of Unavailability of Lower Level of Care for P.R.

*Finally,* CHOMP argues that it was a procedural irregularity for Aetna not to consider that suitable lower level of care for P.R. was unavailable.  Pl. MSJ at 19.  At the Hearing, CHOMP asserted that Aetna's failure to consider the unavailability of lower level of care is the most important procedural irregularity.  The parties' briefing on this issue is unfortunately sparse.  For its part, CHOMP fails to identify which ERISA procedure Aetna allegedly violated.  *See generally*, Pl. MSJ; Pl. Reply.  Aetna does not to address this alleged procedural irregularity in its briefing at all.  *See generally*, Def. MSJ; Def. Reply.  In any event, ERISA requires that in order to conduct a "full and

United States District Court
Northern District of California

fair review" of an adverse benefit determination, the reviewing body must "take[ ] into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination." 29 C.F.R. § 2560.503-1(h)(iv).  Thus, failure to consider the Administrative Record in its entirety, if it occurred, would be a procedural irregularity of the ERISA appeal procedures.

Here, to prove this procedural irregularity, CHOMP provides evidence outside of the Administrative Record.  Aetna's medical director, Nancy Bryant, M.D., stated in her deposition that the availability (or unavailability) of lower level of care was not "part of what was reviewed."  Pl. MSJ at 10; Deposition of Nancy Bryant M.D. ("Bryant Dep.") at 73:8-15 (Exh. C to Leitzinger Decl., ECF 50-13).  Specifically, Dr. Bryant testified:

> Q. Okay. Do you have any understanding of whether at any point during this patient's admission an appropriate lower level of care was available to the patient?
>
> A. No. That wouldn't be part of what was reviewed. What comes in is medical level of care requested, an NCS is appropriate based on the member's condition and what's being done or, no, it's not.
>
> …
>
> Q. Okay. So are you saying that you didn't make any evaluation of any lower levels of care available or not available to this patient?
>
> A. No. Not as part of the medical assessing review, no.

Bryant Dep. at 73:8-15, 74:15-22.

In its briefing, Aetna does not dispute that it did not consider the unavailability of lower level care.  Instead, Aetna insists that it denied CHOMP's claim because it found that the care requested (*i.e.*, hospitalization) was not medically necessary.  *See* Def. MSJ at 16; Def. Reply at 11.  In response to the Court's questions at the Hearing, Aetna pointed the Court to the "case summary" document in the Administrative Record prepared by Aetna's medical director, which appears to be a summary of the Administrative Record.  *See* AR at 956-59.  In this document, Aetna noted that "[d]ue to [P.R.'s] severe COPD and her inability to take care of herself, her attending physician documented the need to provide a safe environment for her prior to discharge."  AR at 957.  Aetna further noted that "Plan for discharge to SNF/RCF with calls made with no beds available yet."  *Id.*

The Court finds that Aetna has presented no evidence that contradicts or brings into question Dr. Bryant's deposition testimony.  There is no dispute that the unavailability of a skilled nursing facility was included in the Administrative Record.  And the evidence Aetna cited to at the Hearing merely summarizes the discharge notes that undisputedly contained information about CHOMP's efforts in locating a skilled nursing facility.  Thus, the "case summary" is not evidence of a dispute as to whether Aetna ***considered*** the unavailability of lower level of care in its denial decision, it only shows that the unavailability was included in the Administrative Record and noted by the medical director.  Importantly, the denial letter makes no mention of the unavailability of lower level of care. *See* AR at 960-961 ("The member no longer met acute inpatient criteria. […].  Her care, treatments, and any further monitoring could have been managed at a lower level of care or in a different setting.").

Accordingly, the Court finds that Aetna failed to consider the unavailability of lower level of care and that failure was a violation of ERISA appeal procedural requirements.  CHOMP does not contend that this procedural violation was flagrant enough to change the standard of review to de novo.  For smaller procedural irregularities, like this one, abuse of discretion standard of review applies and "the court may take additional evidence when the irregularities have prevented full development of the administrative record." *Abatie*, 458 F.3d at 973.  Accordingly, the Court supplements the Administrative Record by admitting Dr. Bryant's deposition testimony regarding Aetna's failure to consider the unavailability of lower level of care for P.R. *See id.*; *see also Pac. Shores Hosp.*, 764 F.3d at 1041.

### C.   Level of Skepticism

Next, the Court must determine how much weight it should give to the procedural irregularity in Aetna's review. *Hoffman*, 757 F. App'x at 604.  The Court starts its analysis by noting that the facts in this case do not present a close call as to what was or was not medically necessary to treat P.R.  Instead, the dispute arises from the unfortunate effective homelessness of P.R.  The facts are undisputed and well documented in the Administrative Record. P.R. was a very ill end-stage COPD patient and unable to care for herself without assistance. *See* AR at 191.  P.R. had a "hard time processing thoughts and remembering" causing her to be noncompliant with her

course of medication.  AR at 483.  She presented at CHOMP's emergency room not long after her last stay at the Hospital.  AR at at 191. P.R. was admitted to the Hospital until she was stable enough to be discharged.  AR at 482.  P.R. would have been discharged from CHOMP on January 7, 2016, if her home conditions allowed for her to receive home healthcare. *See* AR at 253 (patient order report on January 7, 2016: "Discharge Home with Equipment/Care"); *see also* AR at 483.  But sadly, P.R. lived in an uninsulated shack behind a home with no plumbing and no heat.  AR 483, 485. P.R.'s home environment was unsafe for her condition and home healthcare would not provide services to P.R. at the "shack" where she lived.  AR 482.  P.R.'s home condition got even worse when P.R.'s landlord left the state, leaving P.R. with access to her "shack" but not the kitchen, phone, or bathroom in the main house.  AR at 500.  From January 8, 2016, until she was discharged on January 23, 2016, CHOMP provided care to P.R. at the Hospital (and billed Aetna for that care) while its discharge planners worked on finding P.R. a suitable lower level of care.  *See* AR at 483-502.

Under these undisputed set of facts, CHOMP and Aetna present fundamentally different views as to what Aetna's obligations as an insurance company are.  Aetna's view is straightforward: based on CHOMP's records documenting P.R.'s medical condition between January 15 and January 23, 2016, ***the requested level of care*** (*i.e.*, actuate hospitalization) was not medically necessary according to the terms of P.R.'s Plan.  A.R. at 960.  Aetna did not consider P.R.'s home condition or the unavailability of lower level of care for P.R.  *See* AR at 960-961.

CHOMP sees things differently.  In CHOMP's view, Aetna must consider what was medically necessary in light of what discharge options were available and acceptable in P.R.'s circumstances.  Because (1) P.R. was virtually homeless and discharge to those conditions would have caused her condition to get dangerously worse and (2) appropriate lower level of care was unavailable to P.R. on the disputed days, CHOMP contends, Aetna was required to pay for P.R.'s hospital stay until appropriate lower level of care was located.

To determine the appropriate level of skepticism, the Court must determine how much weight to give to Aetna's failure to consider the unavailability of lower level of care.  The Court is sympathetic to CHOMP's predicament and appreciates CHOMP's diligent care for P.R. at the

15

Hospital.  That said, the Court finds that Aetna's procedural violation was a minor one because under the terms of P.R.'s Plan, Aetna was not required to evaluate the medical necessity of the requested level of service in light of P.R.'s home condition or unavailability of lower level of care.

P.R.'s Plan covers "medically necessary" services that are "[c]linically appropriate, in terms of type, frequency, extent, site and duration" and are "[n]ot more costly than an alternative service or sequence of services that would be at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease."  AR at 121-22.  Thus, Aetna was not required to cover a higher level of service (*i.e.*, hospitalization) when lower level of service (*i.e.*, skilled nursing, residential care facility, or home healthcare) would have been sufficient to care for P.R.'s condition.

Importantly, the Plan ***excludes*** "[a]ny item or service that is primarily for the personal comfort and convenience of [the patient]" or "[c]are provided to create an environment that protects a person against exposure that can make his or her disease or injury worse."  AR at 69.  This, sadly, is what P.R.'s situation was.  She was virtually homeless, living in an uninsulated shack behind a home with no plumbing and no heat.  AR 483, 485.  If P.R. had a standard living condition, she would have been discharged on January 7, 2016 with home healthcare assisting her with her medication and other nursing needs.  Because a lower level of care was unavailable to her, CHOMP continued her hospitalization until a suitable facility was located.  Her insurance Plan, however, does not cover higher level of care for as long as it would take to locate suitable lower level of care, where inadequate housing is the impediment.

As Dr. Bryant explained in her deposition testimony, while it is true that hospitalizing P.R. ensured that she took her medication as prescribed, hospitalization was not "medically necessary" under her Plan.

> Q: … And my question is if the patient needed a lower level of care and that level of care wasn't available during this admission, would you agree that the patient had no safe option other than remaining in the hospital?
>
> A: … So, I mean, technically I suppose that if you put her in a hospital and you kept her there, you can make sure she got on medications. Would that be the appropriate level? We've already established that it would not be the appropriate level and further we know that as well

United States District Court
Northern District of California

United States District Court
Northern District of California

1

as not part of her covered benefits even with a health plan.

2

Q. What's not part of her covered benefits?

3

A. Maintenance of care that is not considered medically necessary. It's – I'll look for it in the claim exclusions.

4

Bryant Dep. at 75:22-77:9.

5          Because consideration of unavailability of lower level of care was not required under P.R.'s

6    Plan, Aetna's failure to consider that unavailability was ultimately inconsequential to its denial of

7    CHOMP's claim and therefore, the procedural irregularity was a minor one.  Accordingly, the Court

8    tempers its review for abuse of discretion with a mild level of skepticism and will weigh this

9    procedural irregularity in deciding whether an administrator's decision was an abuse of discretion.

10   *See Abatie*, 458 F.3d at 972.

11   **III.      AETNA'S EVIDENTIARY OBJECTIONS**

12         Aetna objects to the introduction of declarations of Angela Cadena (ECF 50-11), Cara Allard

13   (ECF 50-9), Mikko C. Helenius, M.D. (ECF 50-7), Elizabeth Leitzinger (ECF 50-13), Jeffrey E.

14   Barnum M.D. (ECF 50-5), Exhibits K and M to the Cadena. Decl., and Exhibits A though C to the

15   Leitzinger declaration "to the extent they are not part of the Administrative Record and unrelated to

16   any alleged conflict of interest or procedural irregularity."  Def. MSJ at 15.  When evaluating a plan

17   administrator's denial of benefits "a court may consider evidence outside of the administrative

18   record only when procedural irregularities prevented full development of the administrative record."

19   *Broyles v. A.U.L. Corp. Long-Term Disability Ins. Plan,* No. C-07-5305 MMC, 2009 WL 3817935,

20   at *4 (N.D. Cal. Nov. 12, 2009), *aff'd*, 408 F. App'x 67 (9th Cir. 2011) (citing *Abatie*, 458 F.3d at

21   973).

22         **First,** CHOMP responds that its evidence should be considered because it supports a finding

23   of procedural irregularities.  Pl. Reply at 7.  The Court has reviewed the additional evidence

24   submitted by CHOMP for the sole purpose of evaluating the alleged procedural irregularities.  As

25   explained earlier, the Court has admitted Dr. Bryant's deposition testimony regarding whether Aetna

26   considered the unavailability of lower level of care for P.R.  None of the other alleged procedural

27   irregularities CHOMP notes are of the nature to have prevented "full development of the

28   administrative record" and thus do not support consideration of materials outside of the

1    Administrative Record.

2       Aside from Dr. Bryant's deposition testimony (which the Court has admitted into the record),

3 the remaining documents either repeat the Administrative Record or attempt to explain the

4 declarants' views of the Administrative Record.  The Administrative Record speaks for itself and

5 CHOMP has not articulated a justification for augmenting the Administrative Record beyond Dr.

6 Bryant's testimony.

7       **Second,** CHOMP argues that its proffered extrinsic evidence responds to arguments in favor

8 of Aetna's denial decision raised for first time in this motion (*i.e.*, the reasonableness of CHOMP's

9 efforts in finding suitable lower level of care for P.R.).  Pl. Reply at 7.  CHOMP contends that Aetna

10 has argued for the first time in its Motion for Summary Judgment that P.R.'s care is not covered

11 because CHOMP was complacent in arranging a safe discharge plan for P.R. and CHOMP "has

12 never had an opportunity to provide responsive evidence."  Pl. Reply at 5.  Aetna rejects this

13 argument and responds that Aetna's basis for the denial is the same as it was in the denial letters

14 (*i.e.*, not medically necessary) – and Aetna only challenges CHOMP's efforts in finding lower level

15 of care for P.R. to counter CHOMP's arguments that the unavailability of lower level of care

16 supports a finding of abuse of discretion.  Def. Reply at 5.

17       The Court agrees with Aetna that the CHOMP's "complacency" in its search for a lower

18 level of care for P.R. was not one of the reasons provided by Aetna in denying coverage.  *See* AR

19 at 960.  In its opening brief, CHOMP noted its diligent efforts in finding P.R. a suitable placement

20 – to which Aetna responded by citing to the Administrative Record that in Aetna's view, supports

21 the position that CHOMP was not diligent.  *See e.g.*, Def. MSJ at 1 (arguing "from January 9 through

22 January 18, a period of ten days, CHOMP's discharge planner did document a single call to a skilled

23 nursing facility to try to move P.R. to a lower level of care."); *see also id.* at 6-9.  Aetna's responsive

24 arguments and reliance on the Administrative Record do not open the door to a deluge of extrinsic

25 evidence in support of CHOMP's argument that it diligently searched for suitable lower level of

26 care.  Put differently, CHOMP is correct – its diligence is not at issue.

27       Importantly, CHOMP's efforts in locating a suitable lower level of care for P.R. is

28 sufficiently documented throughout the Administrative Record in the notes authored by P.R.'s

United States District Court
Northern District of California

1  doctors and CHOMP's discharge planners.  Thus, admission of additional evidence that simply

2  supports or bolsters the record on CHOMP's diligence is unnecessary.

3  *** 

4  Accordingly, Aetna's objection to CHOMP's evidence outside the Administrative Record is

5  SUSTAINED, with the exception of Dr. Bryant's deposition testimony regarding whether Aetna

6  considered the unavailability of lower level of care.[2]  Because the Court has determined that the

7  abuse of discretion standard with a mild level of skepticism applies to denial of CHOMP's claim,

8  the Court's review is limited to the Administrative Record and Dr. Bryant's deposition testimony.

9  *See Jebian*, 349 F.3d at 1110.

10  For the same reasons, Aetna's request for judicial notice of information from CHOMP's

11  website (Def. MSJ at 17-18), not included in the Administrative Record, is DENIED.

12  **IV.  DENIAL OF BENEFITS**

13  **A.  Legal Standard**

14  "A party is entitled to summary judgment if the 'movant shows that there is no genuine

15  dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of*

16  *Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ.

17  P. 56(a)).  "The moving party initially bears the burden of proving the absence of a genuine issue of

18  material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

19  "Where the moving party meets that burden, the burden then shifts to the non-moving party

20  to designate specific facts demonstrating the existence genuine issues for trial." *In re Oracle*

21  *Corp.*, 627 F.3d at 387.  "[T]he non-moving party must come forth with evidence from which a jury

22  could reasonably render a verdict in the non-moving party's favor." *Id.*  "The court must view the

23  evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the

24  nonmovant's favor." *City of Pomona*, 750 F.3d at 1049.  "Where the record taken as a whole could

25  not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."

26

27

28

---

[2] The Court notes that Aetna does not object to introduction of some of the exhibits to the Cadena Declaration.  The Court has relied on three of those undisputed exhibits for background purposes earlier in this Order.

United States District Court
Northern District of California

1   *Id.* (internal quotation marks and citation omitted).

2        In *Bendixen v. Standard Ins. Co.,* the Ninth Circuit held that where the abuse of discretion

3   standard applies in an ERISA benefits denial case, "a motion for summary judgment is merely the

4   conduit to bring the legal question before the district court and the usual tests of summary judgment,

5   such as whether a genuine dispute of material fact exists, do not apply."  185 F.3d 939, 942 (9th Cir.

6   1999).   *Bendixen,* however, "predated *Abatie* and its requirement that any conflict always be

7   considered, applied an abuse of discretion standard untempered in any way, and did not involve a

8   case where the district court examined evidence outside of the administrative record."   *Nolan v.*

9   *Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009) (citing *Abatie*, 458 F.3d at 969).   Thus, post-

10  *Abatie*, where the district court considers evidence was outside of the administrative record "the

11  protections that summary judgment usually affords the non-moving party" apply and weighing that

12  evidence on summary judgment is improper.  *Nolan v.*, 551 F.3d at 1154-55.

13      **B.    Analysis**

14       This case is about a dispute over CHOMP's bills for P.R.'s stay at the Hospital between

15  January 15 and January 23, 2016.  The Court starts its analysis by stating what the parties do not

16  dispute: while P.R. was a very ill end-stage COPD patient and unable to care for herself without

17  assistance, she would have been discharged from CHOMP on January 7, 2016, ***if*** her home

18  conditions allowed for her to receive home healthcare.  *See* AR at 253 (patient order report on

19  January 7, 2016: "Discharge Home with Equipment/Care"); *see also* AR at 483.  From January 8,

20  2016, until she was discharged on January 23, 2016, CHOMP provided care to P.R. at the Hospital

21  (and billed Aetna for that care) while its discharge planners worked on finding P.R. a suitable lower

22  level of care.  *See* AR at 483-502.  Aetna agreed to pay for P.R.'s care at the Hospital (at the charged

23  rates) until January 14, 2016 – but denied coverage between January 15 and January 23, 2016.

24       The Court has determined that the abuse of discretion standard applies with a mild level of

25  skepticism.   "A plan administrator abuses its discretion if it renders a decision without any

26  explanation, construes provisions of the plan in a way that conflicts with the plain language of the

27  plan, or fails to develop facts necessary to its determination."  *Pac. Shores Hosp.*, 764 F.3d at 1042

28  (citation omitted).  Under the abuse of discretion standard, "a plan administrator's decision 'will not

United States District Court
Northern District of California

20

United States District Court
Northern District of California

be disturbed if reasonable.'"  *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (quoting *Conkright v. Frommert*, 559 U.S. 506, 130 (2010)).   In the Ninth Circuit, the reasonableness standard requires deference to the plan administrator's decision unless it is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts of the record."  *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011). Where, as here, no conflict of interest is found, "the plan administrator's decision can be upheld if it is grounded on *any* reasonable basis."  *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1138 (9th Cir. 2017) (citation omitted).   "In other words, where there is no risk of bias on the part of the administrator, the existence of a single persuasive medical opinion supporting the administrator's decision can be sufficient to affirm, so long as the administrator does not construe the language of the plan unreasonably or render its decision without explanation."  *Id.*

The crux of CHOMP's argument is that because no lower level of care was available to P.R. and she could not be safely discharged to her then-existing living condition, her stay at CHOMP was an "emergency condition" and thus, "medically necessary."  Pl. MSJ at 11-12; 19-23.  In CHOMP's view, in determining whether hospitalization was "medically necessary" for P.R., Aetna was required to consider the unavailability of post-discharge appropriate level of care for P.R.

Aetna responds that it did pay for the care it considered medically necessary for P.R.: her emergency admission, her hospital stay until she was stabilized, and even 7 days after P.R. was ready to be discharged.  Def. MSJ at 15 (citing AR at 142-43, 147, 153-54).  Aetna argues that it reasonably denied coverage for the services provided by from January 15 to January 23, 2016 at the level charged.  *Id.*  In Aetna's view, P.R.'s Plan did not require Aetna to pay for hospitalization, when lower level of care (*e.g.*, skilled nursing or residential care) would have been sufficient for P.R.'s medical condition – regardless of whether that lower level of care was available to P.R.

Thus, the question before the Court is whether Aetna reasonably exercised its discretion in denying the claim for services billed by CHOMP (*i.e.*, P.R.'s care at the Hospital, and not a lower level of care) from January 15 through January 23, 2016 as not medically necessary.  The Court will apply a mild level of skepticism to this analysis due to Aetna's procedural violation of not considering the unavailability of lower level of care.

### 1.  Medically Necessary

CHOMP argues that the care P.R. received was medically necessary under the Plan and federal law.  The Court addresses each argument below.

#### a.  Under the Plan

CHOMP argues that P.R.'s care was covered under the Plan because she was experiencing an "emergency condition."  Pl. MSJ at 11-13.

The Plan defines emergency condition as follows:

> **Emergency Condition**
> This means a recent and severe medical condition — including (but not limited to) severe pain — that would lead a prudent layperson, possessing an average knowledge of medicine and health, to believe that your condition, sickness or injury is of such a nature that failure to get immediate medical care could result in:
> - Placing your health in serious jeopardy;
> - Serious impairment to bodily function;
> - Serious dysfunction of a body part or organ; or
> - Serious jeopardy to the health of the fetus (in the case of a pregnant woman).

AR at 117.

The Plan covers "medically necessary" services that are "[c]linically appropriate, in terms of type, frequency, extent, site and duration" and are "[n]ot more costly than an alternative service or sequence of services that would be at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease."  AR at 121-22.  The Plan does ***not*** cover "[a]ny item or service that is primarily for the personal comfort and convenience of [the patient] or "[c]are provided to create an environment that protects a person against exposure that can make his or her disease or injury worse."  AR at 69.

CHOMP argues that P.R. was experiencing an "emergency condition" because if she was discharged from the Hospital "without an appropriate lower level of care or she would have risked an immediate material deterioration of her condition, including possible death."  Pl. MSJ at 21.  Aetna responds that it paid for what was "medically necessary" to treat P.R. at the emergency room, seven days of hospital care until P.R. was stabilized and ready to be discharged, and even an additional seven days of hospital stay while CHOMP was working on discharge planning.  Def. MSJ

United States District Court
Northern District of California

1    at 15.  In Aetna's view, it reasonably denied the charges for January 15 to January 23, 2016 because

2    it was no longer medically necessary for P.R. to be hospitalized and lower level of care was

3    appropriate.  *Id.*

4          In the Court's view, CHOMP's argument boils down to this: even though it was the

5    Hospital's responsibility to identify and arrange for a lower level of care after she no longer needed

6    to be hospitalized, Aetna was required to pay for P.R.'s hospital stay for as long as it took CHOMP

7    to find her a suitable arrangement.  This position is not supported by the terms of the Plan and

8    CHOMP does not point to any authority to back up this position.  Nothing in the Plan obligates

9    Aetna to continue to pay for acute hospitalization of a patient that CHOMP agrees was no longer

10   needed, until the Hospital fulfills its obligation to find a proper level of post-discharge care that

11   meets the patient's needs.

12         The Administrative Record shows that P.R. was stable enough to be discharged as early as

13   January 7, 2016.  AR at 482.  Doctors at CHOMP did not decide that P.R. needed further

14   hospitalization until they learned of her unfortunate home condition.  *See* AR at 483.[3]  To be clear,

15   the Court recognizes that the Administrative Record undoubtedly shows that P.R. was very ill and

16   unable to care for herself without assistance – a fact that Aetna does not dispute.  But the question

17   before the Court is whether Aetna abused its discretion to conclude that ***acute hospitalization*** was

18   not medically necessary – and the answer, based on the medical record, is no.

19         Nothing in the Administrative Record shows that P.R.'s condition deteriorated from January

20   7 to January 23, 2016, or that P.R. was not stable enough to be discharged to a lower level of care.

21   *See e.g.*, AR at 225 (January 8, 2016: "The patient appears to be pretty much at her baseline, which

22   is marginal."); AR at 226 (January 9, 2016: "[S]he is at baseline and can probably be discharged

23   whenever suitable arrangements have been made."); AR at 228 (January 10, 2016: "The patient is

24   breathing comfortably at this point in time at rest" and "[w]orking with discharge planning on

25   placement."); AR at 229 (January 11, 2016: "overall, she feels about the same as yesterday with

26

27   _____

28   [3] The Court notes that on January 7, P.R.'s doctors put her discharge "on hold" because she was
     "sedated or sleepy and unsafe to send home."  AR at 482.  But her stay at the Hospital on January
     7, 2016 is not in dispute here because Aetna paid for her stay until January 14, 2016.

regards to her respiratory status" and "[w]orking with discharge planning on placement."); AR at 236 (January 15, 2016: "she feels she is about at her baseline at this point" and "work with discharge planning and medical social work on appropriate placement and disposition for the patient."); AR at 237 (January 16, 2016: "She is breathing at what she feels is about her baseline" and "[s]he is aware of the plan for ongoing care here in the hospital as we try and arrange appropriate placement for her."); AR at 238 (January 17, 2016: "The patient feels she is breathing overall at baseline, but had some exacerbation of shortness of breath this morning and she is going to receive some respiratory therapy for this" and "[a]nticipate require more time to arrange a safe placement for the patient."); AR at 239 (January 18, 2016: "The patient is medically stable for discharge pending arrangements by social services."); AR at 240 (January 19, 2016: "unfortunately the patient is effectively homeless. I have alerted discharge planning and social work that the patient will have to discharge from the hospital tomorrow.").

Based on the Administrative Record, Aetna did not abuse is discretion in concluding that the acute hospital stay was no longer medically necessary for P.R. On January 20, 2016, Aetna's medical director spoke with P.R.'s treating physician who agreed that, "in this case there is no reason for this patient to have ongoing hospitalization and he does not disagree with the decision." AR at 876. Based on P.R.'s ongoing stability and her doctors' agreement, it was reasonable for Aetna to deny coverage for P.R.'s stay at the Hospital seven days after she was ready to be discharged.

Specifically, Aetna explained:

> You no longer need to stay in the hospital because (1) your oxygen needs are less or at your normal level; (2) intensive breathing treatments are no longer needed; (3) your breathing rate and breathing at rest are better or at your normal level; (4) blood tests of your lung function are better or back to normal; (5) your heart is able to pump enough blood; (6) your temperature is normal; (7) any infection has been or is being treated; (8) airflow and chest function are better or normal; (9) any pain or nausea is gone or better; and (10) you are able to walk or move normally and your dietary needs are being met. You could receive care in a less intensive setting.

AR at 937 (January 19, 2016 Denial Letter). Further, after CHOMP appealed Aetna's denial of coverage, Aetna affirmed its denial explaining that P.R. "no longer met acute inpatient criteria" because:

24

> [she] was ambulating, tolerating diet, tapering steroids, oxygen saturations were 93 percent on room air. She was hemodynamically stable, afebrile with stable vital signs. Her care, treatments, and any further monitoring could have been managed at a lower level of car or in a different setting.

AR at 960.  Aetna's findings are consistent with P.R.'s medical records – which CHOMP does not dispute.  CHOMP's inability to find an available skilled nursing facility during P.R.'s stay is not a valid reason to find Aetna abused its discretion.

Moreover, CHOMP's interpretation of the "emergency condition" in the Plan is not reasonable.  The Plan describes "emergency condition" as it applies to the patient's existing status – not to what would happen in the future after the patient is discharged.  Nothing in the Plan requires Aetna to look at what was ahead for P.R. or to cover higher level of services as long as lower level of care is unavailable.  In fact, the Plan specifically states that it does not cover services that are "more costly than an alternative service or sequence of services that would be at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease."  AR at 121-22.  Moreover, The Plan does not cover "[c]are provided to create an environment that protects a person against exposure that can make his or her disease or injury worse."  AR at 69.

CHOMP argues that Aetna abused its discretion in denying coverage for P.R. because it failed to consider there was no alternative lower level of care available.  Pl. MSJ at 22-23.  Even with the mild level of skepticism the Court applies to its review because of Aetna's failure to consider the unavailability of lower level of care, there was no abuse of discretion.  This is because P.R.'s Plan did not require Aetna to consider P.R.'s effective homelessness. The Plan expressly excludes "[c]are provided to create an environment that protects a person against exposure that can make his or her disease or injury worse."  AR at 69.   The Court is mindful that P.R.'s living conditions (an uninsulated shack with no access to heat, water, kitchen, or bathroom) were undoubtedly unsuitable for anyone and certainly for P.R. who is an end-stage COPD patient.  P.R.'s *hospitalization*, however, was not needed due to her medical condition, but because her living circumstances were unfortunately so inadequate that home healthcare was unable to serve her needs.  AR at 482.  Otherwise, she would have been discharged on January 7, 2019.  AR at 483.

1    Accordingly, the unavailability of lower level of care was ultimately irrelevant to Aetna's decision

2    that hospitalization was not medically necessary between January 15 and January 23, 2016.

3            Thus, the Court concludes that Aetna did not abuse its discretion to deny coverage for P.R.'s

4    stay at CHOMP from January 15, 2016 through January 23, 2016, under the terms of the Plan.

5                            b.   Under Federal Law

6            CHOMP separately argues that Aetna was mandated to pay for P.R.'s stay at CHOMP under

7    federal law because she was experiencing an "emergency medical condition." Pl. MSJ at 19-22. If

8    a group health plan provides benefits with respect to services in an emergency department of a

9    hospital, it must also cover "emergency services" for "an emergency medical condition." 29 C.F.R.

10   § 2590.715-2719A(b)(3)(i). "Emergency medical condition" is defined as "a medical condition

11   manifesting itself by acute symptoms of sufficient severity (including severe pain) so that a prudent

12   layperson, who possesses an average knowledge of health and medicine, could reasonably expect

13   the absence of immediate medical attention to result in [serious health risks]." *Id.* § 2590.715-

14   2719A(b)(4)(i). "Emergency services" must be provided to "stabilize the patient," meaning "to

15   provide such medical treatment of the condition as may be necessary to assure, within reasonable

16   medical probability, that no material deterioration of the condition is likely to result from or occur

17   during the transfer of the individual from a facility." *Id.* § 2590.715-2719A(b)(4)(iii); 42 U.S.C.

18   1395dd.

19           For the same reasons stated above, the Administrative Record shows that P.R. was not

20   experiencing an "emergency medical condition" between January 15 and January 23, 2016. Her

21   doctors noted repeatedly that she was stable and could be discharged to a lower level of care.

22   CHOMP has not pointed to any authority that would require Aetna, an insurance company, to

23   continue to pay for acute hospital stay for as long as it would take CHOMP to arrange for a suitable

24   lower level of care. While the parties do not discuss this issue in their briefing, the Court notes that

25   a separate body of law, Emergency Medical Treatment and Active Labor Act ("EMTALA"),

26   imposes a duty on hospitals, like CHOMP, to "stabilize" patients who are experiencing an

27   "emergency medical condition" before transferring or discharging. *Bryant v. Adventist Health*

28   *Sys./W.*, 289 F.3d 1162, 1165 (9th Cir. 2002).

United States District Court
Northern District of California

Thus, the Court finds that Aetna did not abuse its discretion in denying coverage as not "medically necessary" under federal law.

## 2. CHOMP's Diligence in Locating Lower Level of Care

In its opening brief CHOMP argued that Aetna abused its discretion in denying coverage for P.R. because it failed to consider there was no alternative lower level of care available. Pl. MSJ at 22-23. In response, Aetna challenges CHOMP's diligence in its search for locating a suitable lower level of care for P.R. after January 7, 2016. Def. SMJ at 15-17. Aetna argues that CHOMP did not even consider residential care facilities (the type of care P.R. was eventually discharged to on January 23, 2016), until Aetna denied the claim. *Id.* at 16. CHOMP responds by describing in detail its efforts in locating a suitable post-discharge arrangement for P.R. Pl. Reply at 11-14.

The Court recognizes that the parties dispute whether CHOMP was diligent in its efforts to find a suitable placement for P.R. (*compare* Def. MSJ at 15-17 *with* Pl. Reply at 11-14). Not all disputed facts, however, preclude summary judgment. The requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

Here, the disputed fact is not material because under the abuse of discretion standard tempered with mild skepticism, CHOMP's diligence (or lack thereof) in locating proper post-discharge placement for P.R. is irrelevant. Aetna denied coverage for P.R.'s acute hospitalization because her doctors (and CHOMP) agreed that she would have been discharged if her home conditions were suitable. *See e.g.,* AR at 876 (January 20, 2016: "Dr Helenius […] states that in this case there is no reason for this patient to have ongoing hospitalization[.]"); AR at 239 (January 18, 2016: "The patient is medically stable for discharge pending arrangements by social services."); AR at 240 (January 19, 2016: "unfortunately the patient is effectively homeless. I have alerted discharge planning and social work that the patient will have to discharge from the hospital tomorrow.").

As the Court explained earlier in this Order, neither the Plan nor the law requires Aetna (an insurance company) to pay for higher level of care until a lower and suitable one becomes available.

1    Thus, it was not an abuse of discretion for Aetna to deny the claim for P.R.'s hospitalization seven

2    days after she was ready to be discharged – regardless of CHOMP's diligence in locating lower

3    level of care for her.

### 3. Doctrine of Contra Proferentem

5        Finally, CHOMP argues that "[b]ecause it is reasonable to understand P.R.'s plan to cover

6    inpatient hospital treatment of an emergency medical condition for a short period of time when a

7    lower level of care is unavailable despite diligence, the doctrine of contra proferentem requires a

8    finding of coverage for P.R.'s services." Pl. MSJ at 23. Doctrine of "*contra proferentem*" requires

9    ambiguous plan terms subject to two different interpretations to be resolved in favor of the plan

10   participant. *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 (9th Cir. 1993).

11       In its briefing, CHOMP fails to identify which term in P.R.'s Plan it contends is ambiguous.

12   At the Hearing, CHOMP identified "Medically Necessary" as the allegedly ambiguous term – which

13   CHOMP asserts should be read to include coverage for an acute care hospital stay while a lower

14   level of care is unavailable.

15       The Plan defines "Medically Necessary" as:

16          Health care services and supplies that a physician, other health care
             provider or dentist, exercising prudent clinical judgment, would
17          provide to a patient for the purpose of evaluating, diagnosing or
             treating an illness, injury or disease. The service or supply must be:
18

19          • Provided in accordance with generally accepted standards of
               medical or dental practice;
20          • Clinically appropriate, in terms of type, frequency, extent, site
               and duration;
21          • Considered effective for the patient's illness, injury or disease;
            • Not primarily for the convenience of the patient, physician,
22             dentist or other health care provider; and
            • Not more costly than an alternative service or sequence of
23             services that would be at least as likely to produce equivalent
               therapeutic or diagnostic results as to the diagnosis or
24             treatment of that patient's illness, injury or disease.

25   AR at 121-22.

26       CHOMP's interpretation of the Plan's "Medically Necessary" definition is a bridge too far.

27   It is not reasonable to read the definition of "Medically Necessary" as taking into consideration the

28   patient's home condition or her unfortunate effective homelessness. Importantly, the Plan

specifically excludes "[c]are provided to create an environment that protects a person against exposure that can make his or her disease or injury worse." AR at 69.  In addition, the Plan excludes services that are "more costly than an alternative service or sequence of services that would be at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease."  *See* AR at 122.  CHOMP has failed to identify any meaningful "ambiguity" in the Plan's "Medically Necessary" language, only that it could be read to include coverage for more expensive level of care when less expensive care is unavailable. CHOMP's interpretation of the "Medically Necessary" language is not reasonable.

Because the "Medically Necessary" language in P.R.'s plan is not ambiguous, doctrine of *contra proferentem* does not apply.

## V.   ORDER

For the foregoing reasons, the Court DENIES CHOMP's Motion for Partial Summary Judgment at ECF 51 and GRANTS Aetna's Motion for Partial Summary Judgment at ECF 55.


**IT IS SO ORDERED.**


Dated: September 11, 2020

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

29